JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

APPENDIX H

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS** Clifford C. Marsden and Ming Xu

**DEFENDANTS** Select Medical Corp., Martin Jackson, Robert A. Ortenzio, Rocco Ortenzio, and Patrcia Rice

(b) County of Residence of First Listed Plaintiff: Grand Rapids, MI
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed: Mechanicsburg, PA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Brian P. Kenney, Peter A. Lennon, and Eric L. Young
Kenney Lennon & Egan  610-940-9099
3031C Walton Rd., #202, Ply.Mtg.PA 19462

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY / PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Med. Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 365 Personal Injury — Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | PROPERTY RIGHTS | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine / PERSONAL PROPERTY | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☒ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | LABOR | SOCIAL SECURITY | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. Sec. 78j(b) and 78t(a) and 17 C.F.R. Sec. 240.10b-5

**VII. REQUESTED IN COMPLAINT:** ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): NA
JUDGE _____ DOCKET NUMBER _____

DATE 8/24/04
SIGNATURE OF ATTORNEY OF RECORD   Eric L. Young

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

APPENDIX I

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

Clifford C. Marsden and : CIVIL ACTION
Ming Xu :
      v. :
Select Medical Corp., :
Martin Jackson, Robert A. : NO.
Ortenzio, Rocco Ortenzio,
and Patricia Rice.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) (XX)

(f) Standard Management – Cases that do not fall into any one of the other tracks. ( )


| 8/24/04 | Eric L. Young | Plaintiffs |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 610-940-9099 | 610-940-0284 | eyoung@kle-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02



UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLIFFORD C. MARSDEN and MING XU, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SELECT MEDICAL CORP., MARTIN JACKSON, ROBERT A. ORTENZIO, ROCCO ORTENZIO, AND PATRICIA RICE,<br><br>Defendants. | ) CASE NO. 04cv4020<br>)<br>) CLASS ACTION COMPLAINT<br>) FOR VIOLATIONS OF<br>) FEDERAL SECURITIES LAWS<br>)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiffs have alleged the following based upon the investigation of plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Select Medical Corp. ("Select Medical" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### SUMMARY OF ALLEGATIONS

1.  This is a federal class action on behalf of purchasers of the securities of Select Medical between July 29, 2003 and May 11, 2004 inclusive (the "Class Period"), who have incurred damages, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The complaint alleges that: (a) throughout the Class Period, as particularized more fully below, Select Medical touted its strong operations and financial performance, reported remarkable quarterly increases in revenues, income and earnings per

share, and represented that the Company was operating pursuant to a business model that would enable it to grow organically and through acquisitions; (b) unbeknownst to investors, Select Medical at all relevant times operated under the shadow of an imminent regulatory crackdown that could have a devastating effect on the Company's operations and financial performance; (c) defendants knew or recklessly disregarded this danger but failed to disclose it to investors and (d) defendants engaged in this conduct so that they and other Select Medical insiders could sell *more than 11 million* of their personally-held Select Medical shares at artificially inflated prices to unsuspecting shareholders for proceeds in excess of *$270 million*.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Select Medical maintains its corporate headquarters in Pennsylvania and many of the acts charged herein occurred in substantial part in this District.

5. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Plaintiffs, Clifford C. Marsden and Ming Xu, as set forth in the accompanying certification, incorporated by reference herein, purchased Select Medical securities during the Class Period and has been damaged thereby.

7. Defendant Select Medical is a Delaware corporation with principal executive offices located in Mechanicsburg Pennsylvania. The Company operates 83 specialty hospitals and outpatient rehabilitation clinics in the United States and Canada including 79 long-term acute care ("LTAC") hospitals. The Company's LTAC hospitals are certified to treat patients with serious and often complex medical conditions such as respiratory failure, neuromuscular disorders, traumatic brain and spinal cord injuries, stroke, cardiac non-healing wounds, renal disorders and cancer.

8. Defendant Martin Jackson ("Jackson") was, at all relevant times, Chief Financial Officer of Select Medical. Jackson sold 184,830 Select Medical shares during the Class Period for proceeds of $5,389,642.

9. Defendant Robert A. Ortenzio was, at all relevant times, Chief Executive Officer President and a director of Select Medical. Robert A. Ortenzio is a co-founder of the Company with his father, Defendant Rocco Ortenzio. Robert A. Ortenzio sold 1,230,995 Select Medical shares during the Class Period for proceeds of $29,680,054.

10. Defendant Rocco Ortenzio was, at all relevant times, Chairman of Select Medical. Rocco Ortenzio is co-founder of the Company with his son, defendant Robert A. Ortenzio. Rocco Ortenzio sold 2,491,486 Select Medical shares during the Class Period for proceeds of $61,137,762.

11. Defendant Patricia Rice ("Rice") was at all relevant times Chief Operating Officer of Select Medical. Rice sold 553,659 Select Medical shares during the Class Period for proceeds of $13,798,535.

12. Rocco Ortenzio, Robert A. Ortenzio, Jackson and Rice are referred to collectively herein as the "Individual Defendants."

13. During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Select Medical was privy to confidential and proprietary information concerning Select Medical, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Select Medical, as discussed in detail below. Because of their positions with Select Medical, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

14. Each of the defendants is liable as a direct participant in, and a co-conspirator with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and directors were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.

Because of their position of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Select Medical's business.

16. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

16. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Select Medical between July 29, 2003 and May 11, 2004, inclusive, and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17. The members of the Class are so numerous that joinder of all members is impracticable. There are approximately 103.7 million Select Medical shares outstanding. Select Medical shares are actively traded on the New York Stock Exchange ("NYSE").

18. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of

the Class may be identified from records maintained by Select Medical or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violations of federal laws that is complained of herein.

20. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

21. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Select Medical; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

22. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to

individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Select Medical Operates LTAC Facilities As "Hospitals-Within-A-Hospital" And Relies Heavily On Medicare Reimbursements For Long Term Acute Care**

23. Select Medical is an operator of 83 specialty hospitals and outpatient rehabilitation clinics in the United States and Canada including 79 long-term acute care ("LTAC") hospitals. Specialty hospitals accounted for 61% of Select Medical's 2003 net operating revenues of $1.4 billion. LTAC hospitals are licensed and certified to treat patients with serious and often complex medical conditions such as respiratory failure, neuromuscular disorders, traumatic brain and spinal cord injuries, stroke, cardiac non-healing wounds, renal disorders and cancer.

24. As particularized herein, Select Medical at all relevant times received a substantial portion of its revenue from Medicare reimbursements. On August 30, 2002, the Centers for Medicare & Medicaid Services (CMS) published final regulations establishing a prospective payment system for Medicare payment of LTACs, ("LTCH-PPS" or the "LTCH Payment System"), which were to be phased-in over the following five years, and which replaced the reasonable cost-based payment system previously in effect. Although the new payment system was designed to be "revenue neutral," it was highly advantageous to Select Medical and its LTAC facilities.

25. Since adoption of the LTCH Payment System, Medicare reimbursement of LTAC patient services has become an increasingly important driver of Select Medical's growth, financing the development and acquisition of new specialty hospitals. Medicare reimbursements constituted 37.3%, 40.3% and 46.0% of Select Medical's net operating revenues in 2001, 2002

7

and 2003 respectively. In the Company's annual report filed with the SEC on Form 10K for the year ended December 31, 2003 (the "Form 10-K"), the Company acknowledged its dependence on LTAC Medicare reimbursements, stating in relevant part, as follows:

> Since nearly half of our revenues comes from patients under the Medicare Program, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in the Medicare program.

26.     The Company operated under a "hospital-within-a-hospital" arrangement. This means that instead of purchasing or building a freestanding structure each time it opens a new facility, Select Medical leases space for its LTAC facilities within a "host" general acute care hospital and operates the facilities within the host hospitals as independent and separately licensed LTAC hospitals. Between 2001 and 2003, the Company completed the development and opening of 26 LTAC hospitals, and the core of the Company's ongoing growth strategy was to open eight to ten long-term acute care hospitals each year, "using primarily our 'hospital-within-a-hospital'" arrangement. The hospital-within-a-hospital arrangement benefited Select Medical by eliminating the capital costs that would otherwise be incurred to build or purchase a freestanding structure. The hospital-within-a-hospital arrangement benefited the general acute care host hospital by generating lease income from space that would otherwise be unused.

27.     Most importantly to Select Medical, the hospital-within-a-hospital arrangement also provided a mechanism whereby the general acute care host hospital on the one hand, and the LTAC hospital-within-a-hospital, on the other hand, working together, could turn a single Medicare reimbursable episode into two such episodes and thereby materially increase overall Medicare reimbursements. The explanation for this is as follows: Medicare will typically reimburse general acute care hospitals for no more than six days of patient care, regardless of whether the patient remains at the hospital for a longer period. Consequently general acute care hospitals generally lose money on critically or chronically ill long-term acute-

care patients, *i.e.* because Medicare reimburses a flat rate, premised on the six-day stay, regardless of the length of the patient's stay. General acute care hospitals, therefore, have a tremendous incentive to discharge patients within six days of admittance and LTACs hospitals have a tremendous incentive to accept such patients because, in contrast to general acute care hospitals, Medicare reimburses LTAC hospitals for a *minimum* of 25 days of inpatient care and reimburses under a higher rate.

28.   The discrepancy between Medicare reimbursement rates for general and long-term acute care patients, coupled with Select Medical's hospital-within-a-hospital arrangements, were essential to the success of Select Medical's financial performance and prospects and the addition of LTAC hospitals-within-a-hospital were at the core of its growth strategy. During the relevant period, more than half of Select Medical's referrals (54%) came from the host general acute care facilities and, in its Form 10-K, Select Medical stated that it "conducts an extensive review" of potential host hospitals "to determine the number of referrals we would have likely received from it on a historical basis."

29.   The Company acknowledged the importance of Medicare reimbursements in the hospital-within-a-hospital context in its Form 10-K as follows:

> *[T]he prospective payment system for general acute care hospitals creates an economic incentive for general acute care hospitals to discharge medically complex patients as soon as medically possible. We believe that the incentive for general acute care hospitals to discharge medically complex patients as soon as clinically possible creates a substantial referral source for our inpatient and outpatient providers.* [Emphasis added.]

**CMS Comes To Suspect That The Hospital-Within-A-Hospital Arrangement Creates The Danger Of Medicare Abuse, Putting Select Medical's Business Model In Danger**

30.   During the Class Period, CMS, which administers the Medicare program, grew increasingly suspicious of the practice of host general care hospitals referring large numbers of patients to hospital-within-a-hospital long term acute care facilities. CMS believed

9

that this practice increased the risk of patients who did not really need long-term acute care being transferred to long term acute care facilities not for the patients' purposes but to reduce the cost to the general acute care host hospital (which might otherwise have to keep the patient beyond the six-day reimbursable period) and to tap into additional Medicare payments designated specifically for long-term acute care facilities such as those operated by Select Medical. Medicare officials believed that, even if the host hospital and hospital-within-a-hospital were separately owned, the two entities would have incentives to work together to receive this result. Accordingly, throughout the Class Period, CMS was actively considering implementation of regulations that would address this problem by limiting the number of patients that could be referred from a host hospital to its hospital-within-a-hospital. If implemented, such regulations would have a devastating impact on Select Medical's business.

31.     As a healthcare industry giant with $1.4 billion in annual revenues, more than half of which comes from Medicare payments, Select Medical at all relevant times kept a very close eye on Washington D.C. and policy changes affecting its programs. It had extensive contacts with industry and government insiders, and unlike the investing public, it knew that the propriety of the host to hospital-within-a hospital-referrals was being scrutinized by federal regulators. Indeed, in November 2003, Robert A. Ortenzio was a co-panelist with Sally Kaplan, Esq., a representative from the Medicare Payment Advisory Commission ("MedPAC") and Tzvi Hefter, CMS's Director, Division of Acute Care, Hospital and Ambulatory Policy Group, at a "Healthcare Summit" in Washington D.C., sponsored by the American Bar Association, where these issues were a discussion topic. The U.S. Office of Inspector General's 2004 work plan described the government's intention to study providers' use of the "hospital within a hospital" model for furnishing long-term acute care hospital service. Thomas A. Scully was appointed to